The next case will be 051538 Silicon Image v. Genesis Microchip There was an assumption that 32.5 million pieces would be dealt with by that provision and then royalties under 1A would not come into play until after 32.5 million had been sold. Right, but as the court pointed out, there are two answers to that. Number one, your honor, the implication that was drawn from the 32 million pieces that therefore the parties must have been agreeing on a deal that provided for payment of royalties regardless of claim structure is not one that's at all compelled. It's equally reasonable to assume that as a matter of compromise for the purposes of this settlement, Genesis simply agreed that they'd pay royalties on the existing product, which is a particular receiver. In other words, compromise the issue of whether there was claim coverage. There's no basis in the agreement for vaulting that into a concession that somehow there's a broad agreement here to pay regardless of whether any claim coverage exists. And in fact, that implication would contradict what really is the pretty explicit language of the agreement on the royalties, which says that those royalties are payable because the use of the claims is subject to those royalties. That's conventional patent license language. And I think we need more than one of multiple possible implications from the treatment of the 32 million to override that explicit language. It would be different if that language was ambiguous, but it's not. That language says that Genesis gets the right to practice, the right to use certain claims subject to the payment of royalties. Now, there's also a provision in there that, hey, we're trying to settle the litigation. We'd like to resolve our problems. Again, to allow that goal to somehow override other languages, which is explicit, just is not appropriate. This agreement looks like it was written by two non-lawyers in a restaurant. It was written under pressure of the judge saying, I'm going to decide this case immediately unless you guys settle. That night they got together, as we know. And I'm wandering into extrinsic evidence, but I want to back off from that for a second. Because, first of all, we've been accused a number of times in the other side's brief of taking the position that you should only look at Section 1 and not consider any other part of the agreement. We've never taken that position. We're not so foolish as to say that you don't look at the whole deal to see what any particular provision means. But what we are saying is that those other provisions are too general. They're all subject to multiple ways of implying things, and they cannot overrule explicit language which says that it's the use of the claims that is subject to royalty. Now, if we're right that a proper construction of this agreement unambiguously puts it into the category of a typical license where you license claims and you pay for the use of those claims, then you never get to all this other evidentiary stuff. It's clearly improper to delve into extrinsic evidence if the agreement itself tells us what the deal is. And, you know, we've talked about this issue of, well, they intended to settle the case. But there really was a very significant amount of settlement that took place here. First of all, a bunch of money got paid to Silicon. Secondly, Genesis avoided the threat of immediate injunction, which was staring down their face. Thirdly, Silicon avoided the prospect of possibly having its patent invalidated. And, fourthly, according to this cash payment provision, the parties, in effect, provided for what was believed at that time to be about a two-year sort of period of quiet, of peace. That the issue, you know, we paid them a bunch of money, and for $32.5 million, we wouldn't worry about royalties. This is a fast-moving area of technology. Who knows, by the time that that happened, products would be different. There's no way of predicting that. But if you had to check and see what was used and what infringed, then you would have to worry about royalties. Two years downstream. That's correct, Your Honor. But talking about the general provisions in this agreement, another one, right up front, says that the parties are going to explore a long-term commercial alliance. I'm sorry. The two years, was that just based on an estimate of how long the $32 million would take? It was an estimate of how long it would take. Okay. There was nothing in the agreement about that. No, no. That's all it was. But the parties, up front, said that, in addition to settling the litigation, one of their goals was to develop a long-term alliance, to explore that. Had that happened during the two years of peace, the whole tone and relationship could have been different. Nonetheless, at the end of the two years, if there hadn't been a resolution, Then we'd be back in the same book. Then you'd be in court. That's right, Your Honor. And the agreement provided for that and said that there would, A, be a dispute resolution procedure that would try to avoid court, and if ultimately that couldn't be successful, that any construction of this contract that was at issue would be in the courts of California. And so the parties did provide... Construction of this contract. That's right. Including issues, for example, of claim scope. They would be before the California court? State court? Could be, but not as to validity or injunction. No, but certainly as to the scope of your royalty responsibilities. So you'd have a California superior court judge encountering a patent case. Well... That's what the parties had in mind? We believe that that's what the agreement says, but even if it has to go to the other court, to the federal court, my fundamental point is not which court it's going to be in, but that the parties contemplated the possibility, they hoped it wouldn't happen, of future disputes, after all, in the HDMI situation, under the second of the three licenses here, the products hadn't even been defined at that point, so who knows what was going to be, you know, what the issues were going to be. The basic, even more fundamental point is this. The parties said they wanted to settle the problems, even if the agreement, which was hashed out at a dinner meeting by non-lawyers, even if that agreement didn't succeed very well in solving the problems, there's no doctrine that says that when the basis of royalty obligation is clearly set out in the royalty and license clause, that the district court judge has the power to now rewrite that clause in order to achieve the settlement that he thinks the parties wanted to achieve. The contract has to control. If it doesn't succeed very well because it wasn't dealt with over a long enough time, okay, but nonetheless, what determines what royalties are payable here is the provision for those royalties, and that is clearly and unambiguously linked to the use of the licensed claims. There'd be no other reason for having put those claims in there. And one thing I did want to point out is that we've argued all along that in construing that royalty clause, you have to read it in conjunction with the license clause. Those are two halves of the same sentence. And interestingly, after some time taking the position that, no, these are entirely separate, when we pointed out that if you just look at the royalty clause, there's uncertainty about which royalty would be due because each of these three clauses sets a different rate for transmitters and receivers. And so if you're only looking at those clauses, and you have a transmitter, you don't know which rate applies unless you also look at the license clause. And on page 25 or page 27 of their brief, they say, well, our argument is nonsense because you have to read the entire sentence. That's what they said. We couldn't agree more. In order to see what royalties are due here, you have to read the entire sentence. The problem is they read it wrong. They read it as if it said royalties are due if you sell a product within a certain technological area. That's not what the language says. Well, how about or any transmitter ICs? That seems to be more general. That's right, and it is general. And therefore, unless you look at the license clause, you don't know which royalty is going to apply. That's our whole point here, Your Honor. You want to save your rebuttal? You're into it now. I'll save the rest of it. All right. Thank you. Mr. Larson. I'd like to reserve three minutes on the motion to strike with regard to the addressing of the declained construction issues on the grounds that that portion of their brief is not appropriately before the court. Well, why don't you just go to the merits? That wasn't raised in the opening, so we don't need to hear that. This is a patent case about a defendant who settled a case on the eve of rulings that it had reason to believe would be adverse, and afterwards, having averted trial, concocted a scheme to get out or even destroy the agreement.  But that's motive. Why don't you focus on the language of the agreement? I think the language of the agreement is fairly clear. There is no limitation in the royalty clauses that are set forth in Section 1 and its subsections with regard to whether or not the royalty is limited to products which actually use the patent. It does say have the right to use. Yes, it does. Subject to payment of royalty. That's right. So why isn't he right when he says the royalty shall be based only on use? Well, it doesn't say that the royalty will be based on use. It says that they will have the right to use, and then it delineates what the license grant is subject to royalties. And the subject to royalties clause, as I read that, is the compensation for the right that's granted in the earlier clause. The compensation says that you will pay so much for different kinds of devices, whether they be discrete or integrated receivers or transmitters. And so I think that there's nothing in that royalty clause which explicitly limits the royalty base only to those products that are used. Indeed, because the entire lawsuit was a dispute over whether these products practiced the invention or not, it would seem to be an absurd result to conclude that their interpretation is the correct one. It would have resolved absolutely nothing. So in a sense, for example, the parties that are announcing to the world via press releases and so forth that they have resolved their disputes, they have resolved the patent infringement contentions, when in fact under their reading, they've actually resolved nothing. And it's only if Genesis happens to agree that a particular product practices the patents ensued will they then send us a royalty for it. And since, by the way, they took the position even at the eventual The agreement clearly doesn't resolve nothing. They're paying a lot of money. And under your view, what are they getting for it? Just necessary claims? No, they're getting the rights to non-necessary claims, which was what the underlying patent infringement case was about. They had exceeded the scope of their license by using non-necessary claims. They'd also exceeded the scope of their license by branching out into the So those were the breaches, in effect. Those were the infringements that were on the table and that were the subject of the litigation and were the subject of motions for summary judgment and so forth. So to now claim that we resolved this dispute by essentially deferring all of the same issues that were the subject of the patent infringement suit I think is really unreasonable. Moreover, if you look and read the agreement as a whole, and not withstanding their protestations that they've never taken the position that you should only look at Section 1 or Paragraph 1, their opening brief seems to say that fairly clearly. But in any event, if you look at the MOU as a whole, with its references to the press release, its references to the fact that the parties have settled, its reference to running royalties, and the reference to the fact that they have resolved the case, all support Silicon Image's interpretation of this agreement. And in fact, I think it's the only reasonable result one could reach and that the alternative interpretation that the parties had essentially resolved nothing with regard to the fundamental underlying claims of the patent infringement suit is just not reasonable at all. I could address the patent misuse arguments and claim construction if Your Honor wishes to hear that. Well, they weren't brought up on the opening, so we don't need to hear it for the first time from you. Okay. Thank you. The patent misuse issues, I think... I said we do not need to hear it. Oh, I'm sorry. I misunderstood you. My apologies. Let's just limit our arguments to what was here. It's all in your brief. We've read the brief. We know what they say. Okay. Thank you. Mr. Hillman? Your Honor, can I say a word about the misuse? No. No. I expected you to say that. I thought I'd drop it. You have a reply. Well, I do. And, again, this notion that, well, the agreement resolved nothing if we don't adopt their construction of it. Two points. One, it did resolve a lot, as I've said, and as Your Honor pointed out, it was a bunch of money paid, millions of dollars. We avoided the injunction. We put off for some time the day of having to reckon with the nitty-gritty of claim construction, where the products may have changed, where we may have had an alliance. But even if we assume that the parties labored over dinner one evening and drafted up this MOU, which was supposed to be then changed into a definitive agreement done by the lawyer, but that didn't happen because suddenly it developed that there was a dispute about what the MOU meant. Even if that MOU failed in its mission of resolving the issues, that still, there's no legal doctrine that says that that gives the trial judge the opportunity to rewrite the deal and to change the arrangement for what royalties are payable for what, because the way they set it up, in his view, didn't sufficiently resolve the dispute. There's simply no law that allows that to happen. But there is law that allows the district judge, under those circumstances, if it's unclear what the resolution is, to look to the parole evidence. And I don't see you making an argument that once the parole evidence is viewed that you prevail. Actually, Your Honor, number one, we believe it is clear. I understand that. That's been your front and center position all along. That is your front and center position. We do point out, though, that if one had gone into the extrinsic evidence, we have criticized the district judge's conclusion. Number one, the most telling piece of extrinsic evidence was the email that the Silicon negotiator sent out immediately after the meeting where he said that we're giving you these licenses and I want to quote you. Well, I'm familiar with that. The points you make about that. But the bottom line is you are not, as I understand it, making an argument that even considering all the parole evidence and the findings made by this judge sitting behind your fact on this motion to enforce, that the conclusion based on the parole evidence that the construction of the agreement is, as your opposing counsel urges, that that is clearly erroneous. We're not challenging his underlying findings on who said what on what day. Well, or even the ultimate legal conclusion. We are challenging the ultimate legal conclusion. But setting aside, even assuming that, you mean, you think there was clear error in the parole evidence? Absolutely. We've said that several times in our brief, Your Honor. In fact, when we set up the standard of review, we pointed out that it's the issue of law and the construction and clear error for the ultimate fact findings. But not for the facts specifically found, such as the credibility determination. We're not foolish enough to think that this Court is going to second-guess credibility findings. But we do point out in our brief that all those credibility findings really had nothing to do with the MOU. They were on things like whether the Genesis president hid the imminency of a merger or whether he could make a call out of the Caribbean, stuff like that, which was very remote. What happened here is the judge decided he wasn't going to believe this guy and I think went overboard in giving consequence to that by trying to rewrite the agreement. I think that's what happened, Your Honor. All right. Thank you. That issue was not discussed before. Do you have anything you want to say about that parole evidence? The parole argument was just made. Yes, Your Honor, I would. To the extent that parole evidence or extrinsic evidence is of benefit here to the Court, then I think the evidence is overwhelming in terms of establishing the intent of the parties. And the Court below, in a fairly detailed and involved 89-page opinion, went through all the evidence, held a two-day evidentiary hearing about all the evidence and circumstances surrounding the formation of the agreement as well as events immediately before and after it. And I think it would be what Genesis is asking this Court to do is to basically reject all of the findings of fact of that Court, which did lead to a finding of fact, an explicit finding of fact, that Mr. Donegan knowingly and willingly entered into an agreement that included a royalty base of all the products. And that is a finding of fact that I don't see a basis for this Court to overturn. And I don't believe that the defendant has properly brought before you a clearly erroneous argument and evidence to show that that finding is incorrect and ought to be disturbed. Instead, I read their papers as arguing that you are confined to the four corners of the MOU, that's the only thing that this Court may look at, that that results in an interpretation that is what they urge and all of this extrinsic evidence is just off base. And to me it's a kind of a backdoor challenge to a finding of fact below of what the intent of the parties was and the fact that Genesis knowingly entered into this MOU and knowingly knew what it was agreeing to pay for. Very good. You're entitled on the last word. Mr. Hillman, but let's not repeat anything. I just wanted to correct an error that I made. There were apparently lawyers involved in the actual wording of that MOU. The two principals got together the night of the dinner, but then it was hashed out in a room with the lawyers. So that's what I wanted to say. Okay. All right. Thank you very much. The case is submitted.